[Cite as *In re D.L.*, 2015-Ohio-4806.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
ALLEN COUNTY

IN RE:                                                    CASE NO. 1-15-38

    D.L.,

                                                 O P I N I O N

ALLEGED DELINQUENT CHILD.

Appeal from Allen County Common Pleas Court
Juvenile Division
Trial Court No. 2014 JG 31917

**Judgment Affirmed**

Date of Decision:  November 23, 2015

APPEARANCES:

    *Michael J. Short* for Appellant

    *Holly N. Urbanick* for Appellee

**SHAW, J.**

{¶1} Adjudicated delinquent child-appellant D.L. brings this appeal from the June 20, 2015 disposition of the Allen County Common Pleas Court, Juvenile Division, wherein D.L. was ordered to serve, *inter alia*, 90 days in the Allen County Juvenile Detention Center as a term of community control after D.L. was adjudicated delinquent by reason of committing rape in violation of R.C. 2907.02(A)(1)(c), a felony of the first degree if committed by an adult.

{¶2} On October 7, 2014, a complaint was filed alleging that D.L. was delinquent by reason of committing two counts of rape in violation of R.C. 2907.02(A)(1)(c). (Doc. No. 1). One count alleged that D.L. vaginally raped the alleged victim, S.W., and the other count alleged that D.L. orally/anally raped S.W.

{¶3} It was alleged that the rapes occurred on July 16, 2014, when both D.L. and S.W. were at a party. Further, it was alleged that S.W. was substantially impaired and unable to consent and that D.L. knew or had reasonable cause to believe that S.W. was substantially impaired. (Doc. No. 1).

{¶4} D.L. denied the allegations and the matter proceeded to an adjudicatory hearing on February 11, 2015. At the hearing the State called nine witnesses including the alleged victim, two of the victim's friends who went to the party with the victim, the Sexual Assault Nurse Examiner ("SANE") who performed the rape kit on S.W., and the BCI members who tested swabs from

S.W. that were collected by the SANE. From the swabs it was determined that D.L.'s DNA was present in the victim's vaginal cavity. In his case-in-chief, D.L. called one witness and also testified on his own behalf. At the conclusion of the hearing the trial court took the proceedings under advisement.

{¶5} On February 18, 2015, the trial court filed a judgment entry finding beyond a reasonable doubt that D.L. was delinquent by reason of rape on the vaginal rape allegation. (Doc. No. 42). However, the trial court determined that the State had not proven beyond a reasonable doubt that D.L. committed the oral/anal rape allegation. (*Id.*)

{¶6} On June 8, 2015, the matter proceeded to a dispositional hearing. The trial court ordered D.L. to be committed to the legal care and custody of the Ohio Department of Youth Services for an indefinite term of one year and a maximum period not to exceed the age of 21. That commitment was suspended under several conditions, which included, *inter alia*, that D.L. be placed on community control supervision and have no further violations of law. D.L. was also ordered to serve 90 days in the Allen County Juvenile Detention Center as a condition of community control. A judgment entry memorializing D.L.'s disposition was filed June 10, 2015. (Doc. No. 50).

{¶7} It is from this judgment that D.L. appeals, asserting the following assignment of error for our review.

## ASSIGNMENT OF ERROR
## THE CONVICTION IS AGAINST THE MANIFEST WEIGHT
## OF THE EVIDENCE.

**{¶8}** In his assignment of error D.L. argues that he was improperly adjudicated delinquent by reason of committing rape. Specifically, D.L. argues that his adjudication was against the manifest weight of the evidence.

**{¶9}** An appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387 quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

**{¶10}** In this case D.L. was adjudicated delinquent by reason of committing rape in violation of R.C. 2907.02(A)(1)(c), which reads

> **(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:**

* * *

**(c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.**

{¶11} In this case the State called nine witnesses to prove its case against D.L., beginning with K.P., who was a good friend of the victim. K.P. testified that on the night of the alleged incident she was with the victim, S.W., and another female friend, J.Y., at J.Y.'s residence. K.P. testified that the three of them were picked up by two other individuals who drove them to a party at G.B.'s residence. K.P. testified that they went to the party to drink alcohol.

{¶12} K.P. testified that when the girls arrived at G.B.'s residence they began drinking vodka, mixing drinks with some of it. K.P. testified that S.W. also drank vodka straight out of the bottle. According to K.P., those present at G.B.'s residence then played a card-based drinking game called "Kings." K.P. testified that S.W. had the most to drink, that she was drinking straight out of the large milk-jug-sized bottle of vodka and that it was getting noticeably lower as she drank. K.P. testified that the game ended when S.W. went to get up and she fell backwards. K.P. testified that they helped S.W. up and they went over and sat next to a bonfire. K.P. testified that while they were around the fire S.W. was falling over her.

{¶13} K.P. testified that D.L. approached her while they were around the fire and asked K.P. if she could get S.W. or J.Y. to perform fellatio on him. K.P. testified that she asked both S.W. and J.Y. and they both said no. K.P. testified that she began to feel uncomfortable after that so she went inside to the bathroom to call someone and ask for a ride. K.P. testified at that time S.W. was with G.B., as G.B. had helped her into the house because S.W. was so drunk she could not walk.

{¶14} K.P. testified that J.Y. was with her in the bathroom making calls for a ride and that they got a friend to agree to come and get them. K.P. testified that when she left the bathroom with J.Y. she went looking for S.W. and checked G.B.'s bedroom. K.P. testified that when she opened the door to G.B.'s room she saw S.W. on G.B.'s bed and G.B. was on top of her. K.P. described S.W. at that time as almost unconscious, stating that she appeared to be sleeping. K.P. testified that S.W. was not wearing any clothes and that G.B. was leaning over on top of her with his pants down a little. K.P. testified that G.B. ran out of his room when she walked in. K.P. testified that she then tried to get S.W. to respond, that S.W. did not respond at first but eventually she got her to respond. K.P. testified that she helped S.W. get dressed then told her to wait with the door shut and not let anyone in other than K.P. or J.Y.

{¶15} K.P. testified that J.Y. went and tried to help their ride locate them. K.P. testified that when she next came back to G.B.'s room she found D.L. on top

of S.W. and all of S.W.'s clothes were off again. K.P. testified that D.L.'s pants were down slightly and D.L. was leaning over her. K.P. testified that S.W. was "[o]n her back, like with her arms and legs spread open." (Tr. at 31). K.P. testified that she screamed and D.L. left the room. K.P. testified that she then helped S.W. get dressed again but it was harder the second time because S.W. was "more out of it than the time before." (*Id.*)

{¶16} K.P. testified that as they were walking out of G.B.'s residence S.W. leaned over and kissed G.B.'s sister on the cheek. K.P. testified that D.L. then said that S.W. had just performed fellatio on G.B. and D.L. K.P. testified that she had to help S.W. walk out to their ride. K.P. testified that S.W. was very unresponsive and what she was saying was not making sense. K.P. testified that S.W. was crying hysterically, and at some point in the car ride she was saying "she was raped, and she wanted to go home * * * and see her mom." (Tr. at 36). K.P. testified that their ride dropped the three girls off near the movie theater, which was close to J.Y.'s residence. K.P. testified that S.W. was puking and shaking, so K.P. eventually called their parents and S.W. was taken to the hospital.

{¶17} The State next called J.Y., who corroborated K.P.'s testimony regarding the events leading up to the drinking game at G.B.'s residence. Regarding the party, J.Y. also testified that S.W. was drinking more than anyone else, and was drinking straight from

{¶18} the vodka bottle. J.Y. testified that when the drinking game finished S.W. could not walk because she was so drunk so G.B. had to help her. J.Y. testified that S.W. indicated she had to go to the bathroom so G.B. helped her inside. J.Y. testified that after S.W. used the bathroom they were going to go outside but G.B. stopped them and said S.W. could stay inside but J.Y. should go outside with D.L. J.Y. testified that she took G.B. to mean they should go do "sexual things." (Tr. at 54-55). J.Y. also testified that she thought G.B. meant to do sexual things with S.W. (Tr. at 55).

{¶19} J.Y. testified that she spoke with K.P. about being uncomfortable as the party had escalated beyond "fun and drinking." (Tr. at 55). J.Y. testified that K.P. had said earlier if J.Y. "gave [D.L.] a blow job" she would get a "blunt," but J.Y. said no. (*Id.*)

{¶20} J.Y. testified that when she became uncomfortable she went to the bathroom with K.P. to call for a ride. J.Y. testified that they decided to call from the bathroom since they thought the boys would be angry if they were leaving "[b]ecause they obviously wanted stuff to happen, and they didn't want us to leave yet, so we decided to hide it." (Tr. at 58).

{¶21} J.Y. testified that when she walked past G.B.'s bedroom on the way to the bathroom she witnessed G.B. and S.W. kissing, but G.B. was "literally holding [S.W.] up." (Tr. at 57). J.Y. testified that S.W. was "propped up against the door and her head was leaned back, and pretty much she couldn't control

herself." (*Id.*) J.Y. testified that she and K.P. were in the bathroom ten minutes or less, then went outside to tell a friend they were leaving.

{¶22} J.Y. testified that she then went into G.B.'s room and saw S.W. "completely passed out" with her pants and underwear around her ankles and G.B. on top of her. (Tr. at 59). J.Y. testified that G.B. jumped up and walked out of the room. J.Y. testified that at that time D.L. was in the room with G.B. and S.W., off to the side, "just standing there." (*Id.*)

{¶23} J.Y. testified that S.W. was unconscious or passed out, that she tried to wake her up and put her pants back on. J.Y. testified that S.W. did not know what was going on and could not control her body. (Tr. at 60). J.Y. testified that they then went to the porch to wait for their ride. J.Y. testified that S.W. was mumbling that she was raped. (Tr. at 62).

{¶24} J.Y. testified that they had their ride take them near the movie theater in Lima. J.Y. testified that as they were walking to her sister's residence, S.W. collapsed in a field, puked repeatedly, was crying and stating over and over that she was raped. (Tr. at 63). J.Y. testified that K.P. called their parents and that S.W.'s parents took S.W. to the hospital. J.Y. testified that she went with them to the hospital.

{¶25} J.Y. did testify that she knew S.W. and D.L. had been "physical" before, at the end of May. (Tr. at 66-67). J.Y. testified that she knew the date because of a picture K.P. had taken from that night and she remembered it being

from that night. The picture she recalled was not of D.L. On cross-examination J.Y. added that she never specifically saw D.L. on top of S.W.

{¶26} The State next called the victim, S.W., who corroborated the girls' testimony up to them playing drinking games. S.W. testified that she had been drunk before, and that she felt intoxicated when she fell out of her chair. She testified that she remembered having to go to the bathroom while at G.B.'s, but does not remember anything after that other than eventually being in a car and then later the hospital. S.W. testified that she did not remember talking to the SANE, or being in G.B.'s bedroom.

{¶27} S.W. testified that she would not have had sex with D.L. on the night of the incident. S.W. also testified that she had not had sex with D.L. in the days prior to the July incident, but she did not deny that she had had sex with him previously in May of 2014. S.W. also testified that she was not, nor had ever been, the spouse of D.L.

{¶28} The State next called T.B., G.B.'s older sister. T.B. testified that on July 16, 2014, G.B. had some friends over, which included S.W. T.B. testified that at one point G.B. had carried S.W. into the bathroom while T.B. was taking a bath. T.B. testified that she never saw S.W. passed out, but that S.W. did kiss her on the cheek when she was leaving and at that time D.L. had said that S.W. had just performed fellatio on both D.L. and G.B. T.B. testified that she was disgusted.

{¶29} The State next called Officer Timothy Goedde of the Lima Police Department. Officer Goedde testified that he investigated this case and that he interviewed D.L. Officer Goedde testified that D.L. was cooperative, calm, and not nervous during the interview. Officer Goedde testified that D.L. indicated that he knew that S.W. was intoxicated at the party and that she needed help walking. Officer Goedde testified that D.L. indicated that S.W. had performed fellatio on him in the past, but he had never had sex with her and did not on July 16, 2014.

{¶30} The video recording of Officer Goedde's interview with D.L. was entered into evidence. In the video D.L. provided his account of the evening. D.L. stated that at one point he walked into G.B.'s room and saw S.W. giving G.B. "oral," and then D.L. promptly left the room. (State's Ex. 4). D.L. stated that he later walked into G.B.'s room and saw G.B. "giving [S.W.] oral." (*Id.*) D.L. stated that he walked in the second time to let G.B. know that G.B.'s older sister was home. D.L. stated that he again left the room promptly. (*Id.*)

{¶31} D.L. stated that he did not have sex with S.W. on July 16, 2014, and that he had never had sex with her before. (*Id.*) He did state that S.W. had previously performed fellatio on him, but not on July 16, 2014. (*Id.*) D.L. then voluntarily submitted a DNA sample to be tested.

{¶32} The State next called D.H., who was the friend J.Y. and K.P. had called to pick them up from G.B.'s residence. D.H. testified that J.Y. called him and stated that some guys had dragged S.W. into a dark room and J.Y. did not

know what to do or what was happening. (Tr. at 153). D.H. testified that he agreed to pick them up. D.H. testified that when he arrived he had to carry S.W. and that she fell.

{¶33} The State next called Victoria Casey an RN and SANE for St. Rita's in Lima, Ohio. Casey testified that S.W. was brought in around midnight or 1 a.m. on July 17, 2014. Casey testified that S.W. was initially unresponsive and there were questions about whether she had been sexually assaulted. Casey testified that S.W. was put in trauma because there were questions about whether she could protect her airway.

{¶34} Casey testified that when she first saw S.W. she looked roughed up, her hair was a mess, there was vomit in it, her clothes were disheveled, she could not verbally respond and she would not open her eyes. Casey testified that S.W. did not respond to a sternal rub but eventually responded 15-20 minutes later and opened her eyes.

{¶35} Casey testified that S.W. was unable to speak so she learned of what happened from J.Y. Casey testified that she then obtained permission from S.W.'s mother to perform a rape kit examination.

{¶36} Casey testified as to the procedures used and all of the evidence she collected when conducting the rape kit examination. Casey specifically testified that she swabbed S.W.'s vagina, anus, and her oral cavity. Casey testified that there was "quite a lot" of a white milky discharge in S.W.'s vaginal cavity, so she

swabbed it and collected the evidence. Casey also testified that S.W.'s blood-alcohol content was between .20 and .24.

{¶37} The State next called Alex Thiel of BCI, who was classified, without objection, as an expert in forensic biology analysis. Thiel testified that she tested the rape kit and that semen was identified on all four of the vaginal swabs provided to her and all four of the anal swabs as well. Thiel testified that she identified a single sperm cell in the oral sample. Thiel testified that the samples were then sent to London for DNA testing. Thiel did testify that semen could stay in the vagina for as long as 3-5 days, and in the mouth for approximately 5-6 hours. A report of Thiel's findings was introduced into evidence. (State's Ex. 2).

{¶38} The State next called Katherine Hall, a forensic scientist who was classified as an expert in forensic DNA analysis, without objection. Hall testified as to what DNA is and her procedures for testing for DNA. Hall testified that the semen from the vaginal and anal/perianal swabs were consistent with D.L.'s DNA and that the chance of someone else having that same DNA were 1 in 266 quintillion.[1] Hall testified that the oral sample was also consistent with D.L.'s DNA; however, the chance of someone else having that same DNA was 1 in 309,400. Hall testified that the results of the oral, anal and vaginal samples *excluded* G.B. A copy of Hall's report was introduced into evidence. (State's Ex. 3).

---

[1] Or, written out, 1 in 266,000,000,000,000,000,000.

{¶39} At the conclusion of Hall's testimony, the State rested its case. D.L.'s counsel then made a Crim.R. 29 motion for acquittal, which was overruled. D.L. then proceeded to his case-in-chief and first called B.W., who was a friend of D.L.'s and had picked up S.W. and her friends to go to G.B.'s house on the night in question.

{¶40} B.W. testified that the group played the drinking game Kings together and that the game ended when the vodka bottle ran out. B.W. testified that everyone including S.W. was also smoking marijuana, and that he specifically saw S.W. drink and smoke. In addition, B.W. testified that he saw S.W. and D.L. having sex a couple of days prior to the alleged incident in a bathroom at another house.

{¶41} On cross-examination B.W. testified that he did not tell the police during his interview about the prior sexual act that he witnessed between S.W. and D.L., and that he knew S.W. was extremely drunk on the night in question.

{¶42} D.L. then took the stand himself and testified. D.L. testified that he was very drunk and high on the night in question but he did not have sex with S.W. D.L. testified that he saw G.B. performing oral sex on S.W., as he stated in the police interview, but that was all. At trial D.L. testified that, unlike in his police interview, he did not witness S.W. performing fellatio on G.B.

{¶43} D.L. also testified that on July 14, 2014, two days prior to the incident, he had engaged in consensual oral and vaginal intercourse with S.W., but he did not engage in sexual contact with her on July 16, 2014.

{¶44} On cross-examination when D.L. was asked why he did not tell the officer about the intercourse he had with S.W. during his interview D.L. testified that he did not think the officer needed to know.

{¶45} At the conclusion of D.L.'s testimony the defense rested. The parties proceeded through closing arguments and the case was taken under advisement.

{¶46} On February 18, 2015, the trial court filed a written entry outlining the facts from the trial, and then came to the following conclusion.

> **Upon consideration of all of the evidence, including the testimony and demeanor of all witnesses, the Court concludes beyond a reasonable doubt that [D.L.] engaged in vaginal sexual intercourse with S.W. on July 16, 2014 in \* \* \* Lima \* \* \* Ohio. Whether or not [D.L.] and S.W. had engaged in consensual sexual intercourse two days or two months earlier is not ultimately determinative of whether vaginal intercourse had occurred on July 16, 2014. The Court also notes that in his statement made to Officer Goedde on July 28, 2014 (and prior to the taking and submission of DNA samples to BCI) [D.L.] denied ever having had vaginal intercourse with S.W. at any time. His later statement that he had, in fact, had intercourse with her 1-2 days earlier renders his version of the events less credible than that of the other witnesses.**

(Doc. No. 42).

{¶47} The trial court then also determined beyond a reasonable doubt that

-15-

> **S.W.'s ability to resist or consent was substantially impaired and that her substantial impairment was obvious to those present, including [D.L.].  The Court therefore concludes beyond a reasonable doubt that [D.L.] had reasonable cause to believe that her ability to resist or consent was substantially impaired and that he, in fact, knew her ability to resist or consent to be substantially impaired.**

(*Id.*)

{¶48} Lastly, the trial court found that based on this Court's decision of *State v. Harmath*, 3d Dist. Seneca No. 13-06-20, 2007-Ohio-2993, voluntary intoxication qualifies as a mental or physical condition within the meaning of R.C. 2907.02(A)(1)(c).

{¶49} On appeal, D.L. now argues that his adjudication was against the manifest weight of the evidence.  He contends that none of the witnesses actually saw D.L. engage in sexual contact with S.W.  He also argues that the semen resulted from an earlier, consensual, sexual encounter between S.W. and D.L.  He further contends that the testimony of G.B.'s sister does not support the conclusion that S.W. was intoxicated.

{¶50} Despite D.L.'s arguments, K.P. testified that she specifically observed D.L. leaning over S.W. in G.B.'s bedroom while S.W. was unclothed.  Although K.P. testified that she did not actually observe any sexual intercourse, given that D.L.'s pants were down slightly, and that K.P. testified that S.W. was naked and her legs were spread open, the trial court could draw a logical inference.  Combining this with the fact that the SANE testified that she discovered "quite a

lot" of white, milky discharge in S.W.'s vaginal cavity, and that this milky discharge tested consistent with D.L.'s DNA, we cannot find that the trial court erred in determining that D.L. engaged in sexual intercourse with S.W. on July 16, 2014.

**{¶51}** Although D.L. argues that he had a consensual sexual encounter with S.W. two days prior to the alleged incident, the trial court specifically did not believe his testimony. D.L. had told Officer Goedde in his interview that he had *never* had sexual intercourse with S.W., and that he specifically did not on the night in question. At trial, D.L. testified that he did not think Officer Goedde needed to know that he had sex previously with S.W., yet D.L. had no problem telling Officer Goedde that S.W. had performed fellatio on him previously when they had just met.

**{¶52}** Moreover, further questioning D.L.'s credibility, S.W. testified that she had slept with D.L. in May of 2014 rather than July 14, 2014, as D.L. suggested. Both S.W. and J.Y. testified that they recognized the date because a picture had been taken on that night and posted to Instagram that reminded them of the date. The trial court elected to believe the testimony of S.W. and disregarded the conflicting stories of D.L. Based on the record before us, we cannot find that the trial court erred on this issue.

**{¶53}** D.L. next contends that the testimony of G.B.'s sister, T.B., does not support the finding that S.W. was extremely intoxicated. Notwithstanding T.B.'s

testimony, which does not strongly suggest that S.W. was not extremely intoxicated regardless, there were multiple witnesses who testified that S.W. was extremely intoxicated. S.W.'s friend testified that she was so intoxicated she was essentially unconscious and unresponsive. When S.W. was taken to the hospital her BAC was still .20 to .24, and she was unresponsive for a time at the hospital. Thus D.L.'s arguments on this issue are not well-taken.

**{¶54}** Having reviewed the record we cannot find that the trial court created a manifest miscarriage of justice in finding that D.L. committed rape and thus adjudicating him delinquent. Therefore, his assignment of error is overruled.

**{¶55}** For the foregoing reasons D.L.'s assignment of error is overruled and the judgment of the Allen County Common Pleas Court, Juvenile Division, is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J, concur.**

**/hlo**